## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STEPHEN LAMB and                :    Civ. Action No.  06-2166(NLH)
SUSAN LAMB,
          Plaintiffs,           :

                 v.             :    **OPINION**

DEPUTY CHIEF WYSOCKI, SR.       :
and CITY OF CAMDEN,
     Defendants.                :


**APPEARANCES:**


Alan E. Denenberg, Esquire
Abramson & Denenberg, PC
1315 Walnut Street
12th Floor
Philadelphia, PA 19107
     *On behalf of plaintiffs*

Cheryl L. Cooper, Esquire
Holston, MacDonald, Uzdavinis & Ziegler, PC
66 Euclid Street
PO Box 358
Woodbury, NJ 08096
     *On behalf of defendant Deputy Chief Wysocki, Sr.*


Frank A. Salvati, Esquire
Office of City Attorney
4th Floor - City Hall
Camden, NJ 08101
     *On behalf of defendant City of Camden*

**HILLMAN**, District Judge

     This matter has come before the Court on defendants' motions

for summary judgment on all of plaintiffs' claims arising from

plaintiff Stephen Lamb's arrest on May 14, 2004 by defendant

Deputy Chief Wysocki, Sr. of the Camden Police Department.  For

the reasons expressed below, Wysocki's motion will be granted in

part, denied in part, and continued in part, and the City of Camden's motion will be granted.

## BACKGROUND

According to plaintiff, on May 14, 2004 at around 9:25am, he was driving on the northbound side of "Route 676"[1] in Camden, New Jersey, when he came upon a multi-car accident which appeared to have just occurred.  Lamb pulled over onto the right shoulder to see if he could assist any of the victims.  Lamb and another motorist who had stopped to help noticed a car that had been in the accident spewing black smoke.  They also noticed that the driver of the smoking car appeared to be in "bad shape."  Because there were no police or any rescue personnel on the scene, Lamb and the other motorist pulled the man from the smoking car and laid him on the ground.

According to Lamb, he noticed that the victim's arms were lying in broken glass.  As Lamb lifted the victim's arms out of the broken glass to place them on his chest, Lamb states that he heard someone yelling for him to "get off of him, get off of him."  Lamb states that when he looked up, he saw a man dressed as a "mechanic worker" coming towards him.  The man was wearing blue work pants and a blue t-shirt, without any symbols or other

---

[1]All the parties refer to the highway where the accident occurred as "Route 676."  This stretch of road is actually Interstate 676, but the Court will refer to it colloquially as the parties do.

identifiable marks, and Lamb believes that the man came from across the cement median dividing the southbound and northbound lanes in the area of where a flatbed truck was parked.  Lamb relates that he stood up, and the man pushed him into the guardrail.  When Lamb went to react to being pushed, the man in blue pulled out a badge.  Lamb then realized that the man was a police officer, and Lamb raised his hands, palms up, stating, "officer, this is your job to do."  (Lamb Dep. at 25.)

Lamb then relates that the officer in blue threw him onto a patrol car, which apparently had just arrived on the scene.[2]  The officer treated Lamb "like a ragdoll," and asked a uniformed officer, who apparently had just arrived in the marked patrol car, for his handcuffs.  According to Lamb, the uniformed officer initially resisted giving the officer in blue the handcuffs, but he did.  Lamb claims that three other officers assisted the officer in blue because they were having a hard time getting the

---

[2]There appears to be conflicting testimony about whether Lamb was thrown onto the back or front of the patrol car.  Lamb testifies at his deposition that he was thrown onto the front of the car (see Lamb Dep. at 77), but also that it was the back of the patrol car (see Lamb Dep. at 14).  Either way, Lamb testifies that he saw the patrol car's camera videotaping his arrest. Neither party as submitted evidence with regard to the existence of this videotape, nor has either party clarified whether Lamb was arrested on the hood or trunk of the patrol car.  Although it would be helpful to know whether a videotape of Lamb's arrest exists, the decision to produce such a tape is left to the parties.  Because neither party argues that the location of the arrest--that is, whether on the hood or trunk of the car--is dispositive to the summary judgment motions, these discrepancies will not be considered.

cuffs on Lamb.  Lamb states that he could not understand why they
were having difficulty because he was not resisting.  Lamb
attributes the difficulty to a brace he was wearing that would
not bend.[3]  After Lamb was handcuffed with his hands behind his
back, Lamb asked the officer in blue to loosen the cuffs because
they were too tight and causing him pain.  Lamb states that the
officer in blue responded, "How does this feel?," and he
proceeded to lift up the cuffs to Lamb's shoulder blades.  (Lamb
Dep. at 26.)  Lamb also claims that he was thrown to the ground
after being handcuffed.  Lamb was then placed in the patrol car
and taken to a police station less than five minutes away.  Lamb
was charged with "Obstructing Administration of Law or Other
Government Function," N.J.S.A. 2C:29-1.  He was held at the
Camden County Jail for twelve hours, but the charges were
ultimately dismissed.

The next day, Lamb went to the emergency room for a shoulder
injury he claims he sustained as a result of the force used by
the officer in blue.  Lamb was diagnosed with a shoulder strain
and received Percocet for pain.

During the course of his arrest, Lamb identified the
"officer in blue" as defendant Deputy Chief Wysocki, because
according to Lamb, Wysocki stated, "I'm the chief MF'r."  (Lamb

---

[3]It is unclear from Lamb's testimony on what body part he
wore the brace.

4

Dep. at 71.)  Wysocki, however, tells a different version of events.  Wysocki states that he was traveling northbound to work in a maroon Ford Crown Victoria on Route 676 when the traffic came to a stop.  Realizing that there must be an accident up head, he turned on the flashing lights in the grill of his car, and then proceeded up the right shoulder about 50 yards to the accident location.  Wysocki states that he came upon a Jaguar on the right shoulder that had turned facing oncoming traffic.  He did not notice any smoke, and he did not see the driver in the car.

According to his police report, as Wysocki got out of his car, he observed Lamb attempting to remove a gold wristwatch from the arm of the victim.  Wysocki states that he observed Lamb unclasping the watch from the victim, saying to the victim that he was trying to make him more comfortable.  Wysocki states that Lamb then began to remove the victim's watch.  Wysocki reports that at "this juncture, I identified myself as a police officer and stopped [Lamb] from removing the watch from the victim's wrist.  In doing so, I informed [Lamb] that there is no need to remove the watch or any other personal items from the victim." (Wysocki Police Report, Pl. Ex. B.)

Wysocki reports that Lamb "immediately responded, challenging" his authority, and became verbally abusive and refused to obey his commands.  (Id.)  He then attempted to detain

Lamb so that he could further investigate his actions, and Lamb became verbally and physically combative, which led to his arrest.  Wysocki reports that Lamb "was placed into custody by Sgt. Mulligan and myself, then transported to Detective Division for processing by unit A-17, Officer Reese."  (Id.)

In his deposition testimony, Wysocki states that he was wearing a white shirt and tie with gray pants that day.  Because it was a warm day, he was not wearing his gray suit jacket.  He refutes that he was wearing blue work clothes.  Additionally, Wysocki refutes that he came from the southbound lanes and crossed the median in order to approach Lamb.  He also states that he obtained the handcuffs from a female officer who had come from the southbound lanes, jumping the median and crossing the northbound lanes to get to Wysocki.  He did not receive the handcuffs from the uniformed male officer as claimed by Lamb.  Finally, Wysocki refutes that he pushed or shoved Lamb.  Wysocki does admit, however, that Lamb did not resist being arrested.  (Wysocki Dep. at 89.)

Based on these events, Lamb filed a six-count complaint against Wysocki and the City of Camden.  His claims include: Count I - Excessive force in violation of the federal and New Jersey state constitution; Count II - False arrest/imprisonment and malicious prosecution in violation of the federal and New Jersey state constitution; Count III - Monell claim against the

6

City of Camden for failure to train, deliberate indifference, and unconstitutional policies; Count IV - False arrest, false imprisonment and malicious prosecution under state law; Count V - assault and battery under state law; and Count VI - Susan Lamb's claim for loss of consortium.

Wysocki and the City of Camden have moved for summary judgment on all of plaintiffs' claims.  The Lambs have opposed defendants' motions.

## DISCUSSION

### A.    Jurisdiction

Plaintiffs have brought their claims pursuant to 42 U.S.C. § 1983, as well as pursuant to the New Jersey constitution and New Jersey state law.  This Court has jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.

### B.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

7

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

8

C.   **Analysis**

   1.   **Plaintiffs' claims against Wysocki**

   The Lambs have asserted all their claims except for Count V against Wysocki.  The claims can be separated into two categories: (a) constitutional violation claims and (b) state law tort claims.  Each category will be addressed in turn.

> a.   ***Lamb's claims of excessive force, false arrest/imprisonment, and malicious prosecution in violation of the federal and New Jersey state constitution***

   Lamb claims that Wysocki used excessive force in effecting his arrest, as well as falsely arrested him and maliciously prosecuted him in violation of the Fourth Amendment and the New Jersey Constitution.  The qualified immunity analysis provides the basis to determine whether a claim for a constitutional violation by a law enforcement officer is viable.[4]  The standard

---

   [4]Because the analysis of claims under state constitutional law is similar to the analysis under the Fourth Amendment, no separate analysis will be undertaken for Lamb's claims arising under the New Jersey Constitution.  See Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (granting defendants' motion for summary judgment on plaintiffs' claims under Article I, paragraph 7 of the New Jersey Constitution, because it was already established that there was no federal constitutional violation) (citing Desilets v. Clearview Regional Bd. of Educ., 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) ("We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart. We note that in its T.L.O. opinion the New Jersey Supreme Court analyzed the search and seizure issue under the Fourth Amendment to the United States Constitution, and did not suggest that New Jersey's organic law imposed more stringent standards.")).

promulgated by the Third Circuit is as follows:

> Qualified immunity protects law enforcement
> officers from being tried for actions taken in the
> course of their duties.  If the immunity applies,
> it entitles the officer to be free of the 'burdens
> of litigation.' But the immunity is forfeited if
> an officer's conduct violates 'clearly established
> statutory or constitutional rights of which a
> reasonable person would have known.' To determine
> ... whether the officers have lost their immunity,
> we must engage in a two step analysis. First, we
> must decide 'whether a constitutional right would
> have been violated on the facts alleged . . . .'
> ... Second, if we believe that a constitutional
> violation did occur, we must consider whether the
> right was "clearly established."  The question is
> 'whether it would be clear to a reasonable officer
> that his conduct was unlawful in the situation he
> confronted.' This is an objective inquiry, to be
> decided by the court as a matter of law.

Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004) (citations
omitted).  Thus, in order to determine whether Lamb's claims
against Wysocki are viable, it must first be determined whether
Wysocki violated Lamb's constitutional rights.  If so, it must
then be determined whether those rights were clearly established.

### (i)  Excessive force

Lamb first claims that Wysocki used excessive force on him
while effecting his arrest.  Lamb claims that Wysocki used
excessive force when he pushed him into the guardrail, when he
threw him onto the police car, when he lifted his arms while he
was handcuffed, and when he was taken to the ground after being
handcuffed.  Wysocki argues that he could not have done these
acts because it is undisputed that he did not arrive on the scene

10

from the southbound lane in the area of a flatbed truck, and that
he was not wearing blue work clothes.  Wysocki states that he was
"the officer who informed Plaintiff that he was under arrest" but
"another officer actually physically subdued Plaintiff and
applied handcuffs.  Defendant Wysocki did not participate in the
acts alleged to have constituted a constitutional violation."
(Wysocki Br. at 11-12.)

There are numerous flaws with Wysocki's argument.  First,
Wysocki's claim that it is undisputed that he came from the
northbound lanes is incorrect.  Lamb claims that Wysocki came
from the southbound lanes in the area of a flatbed truck and
jumped over the median in order to arrive at the northbound right
shoulder.  Wysocki claims that he was driving northbound when he
realized there was an accident, and drove up the right shoulder
of the northbound lane until he arrived at Lamb's position.  No
other evidence supports either party's version.  Rather than
being undisputed, this is a classic example of a disputed fact.

Second, regardless from which side of the road Wysocki
approached the scene, Wysocki's claim that he was not wearing
blue work clothes, and therefore could not have handled Lamb the
way he claims, is a conclusion not supported by the record.
Wysocki contends that he was wearing gray pants, a white shirt,
and a tie, not blue work pants and a blue t-shirt as claimed by
Lamb.  To support that contention, Wysocki submits two

certifications of fellow Camden Police Department officers.
Those colleagues attest that when Wysocki came into the detective
bureau that day, Wysocki was wearing a shirt and tie.  (Def. Exs.
C and D.)  Based on this evidence, Wysocki argues that it is
undisputed that he was not wearing blue work clothes.

The problem with Wysocki's position is that neither of his
colleagues were at the scene of the accident, and they do not
relate what time they saw Wysocki that day.  All that the
colleagues' certifications demonstrate is that when Wysocki came
into the detective bureau at some point on May 14, 2004, he was
wearing a shirt and tie.  This evidence does not make Wysocki's
attire at the scene "undisputed."  Indeed, Lamb states that he
did not see any person wearing a shirt and tie on the scene of
the accident.  Even though it is Lamb's burden to ultimately
prove his claims, at summary judgment, it is Wysocki's burden to
show an absence of material fact.  Because the only evidence
Wysocki has provided as to what he was wearing at the scene is
his own testimony, which contradict's Lamb's testimony, this
issue remains disputed.

Another problem with Wysocki's claim that he was not wearing
blue work clothes, and therefore could not have handled Lamb the
way he claims, is Wysocki's police report and deposition
testimony.  Regardless of what he was wearing, Wysocki's self-
described contact with Lamb demonstrates that Wysocki had more

12

contact with Lamb than simply telling Lamb that he was under arrest.  Wysocki states in his police report that when he observed Lamb allegedly removing the victim's watch, he "stopped [Lamb] from removing the watch from the victim's wrist."  It is unclear how he "stopped" Lamb, but according to Lamb, it was by pushing him into the guardrail.  Wysocki has not provided any evidence, other than his own denial, to refute this.

Wysocki also reports that when Lamb became verbally abusive and refused to obey his commands, he then attempted to detain Lamb so that he could further investigate his actions.  Again, Wysocki does not elaborate on how he "attempted to detain" Lamb, but according to Lamb, it involved Wysocki throwing him onto a patrol car.  Wysocki has not produced any evidence, other than his own denial, to refute this.

Wysocki further reports that Lamb was placed into custody by Sgt. Mulligan and himself.  In his deposition, Wysocki states, "I put the handcuffs on.  Either I did or Mulligan did.  I don't remember."  (Wysocki Dep. at 88.)  Wysocki does not present any other evidence--for example, an affidavit or testimony of Sergeant Mulligan--to support his contention in his moving brief that he did not handcuff Lamb.[5]  The fact that Wysocki cannot recall who handcuffed Lamb creates an issue of material fact as

---

[5]Neither party has submitted evidence as to what Sergeant Mulligan was wearing that day.

to Wysocki's contact with Lamb.

Ultimately, Wysocki argues that there must have been an unidentified man in blue work clothes who handled Lamb as he claims.  Wysocki, however, does not provide any undisputed evidence to support that contention.  The evidence that he does provide--namely, his own testimony--makes the circumstances surrounding Lamb's arrest simply his word against Lamb's.   In deciding a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence.  If the Court were to credit Wysocki's version over Lamb's, that is exactly what the Court would be doing. Consequently, Wysocki's position must be considered by a jury.

Despite disputed facts concerning Wysocki's position that because he was not wearing blue, he could not have handled Lamb as he claims, it must still be determined whether Wysocki's contact with Lamb, as alleged by Lamb, could constitute excessive force.  In other words, it must be determined whether Wysocki is entitled to qualified immunity even if Lamb's allegations are proven to be true.

In determining whether excessive force was used during an arrest, the Fourth Amendment's "objective reasonableness" test is applied.  Sharrar v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  The objective reasonableness test "requires careful attention to the

14

facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. (relying on Graham, 490 U.S. at 396; Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)).  In evaluating the proper test for objective reasonableness, the Supreme Court has provided that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396 (1989)(citation omitted). Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."  Id.

According to Lamb, Wysocki pushed him into a guardrail for no reason while Lamb was acting as a good Samaritan in caring for an accident victim.  Then, after Lamb recognized Wysocki as a police officer and backed down from any confrontation, Wysocki threw him on hood of a police car, and after handcuffing him, raised his handcuffed arms up to his shoulder blades, causing him to suffer a shoulder strain.  Lamb also alleges that Wysocki put him on the ground.  These circumstances, if proven by Lamb, could

constitute excessive force.  Even if it appeared to Wysocki that Lamb was attempting to remove a watch from an unresponsive victim, Wysocki's contact with Lamb could be deemed an amount of force in excess of what was warranted by that particular situation.  Lamb was not physically harming the victim, and with a traffic-jammed accident scene, Lamb was not trying to, and arguably could not have tried to, make a quick get away, neither of which necessitated Wysocki pushing Lamb into a guardrail in order to restrain him.  Further, Lamb was not posing an immediate threat to anyone at the accident scene.  Additionally, Wysocki admits that Lamb was not resisting arrest, making Wysocki's alleged conduct of throwing Lamb onto the patrol car, lifting Lamb's handcuffed hands up to his shoulder, and taking him to the ground unnecessary to effectuate the arrest.  Consequently, taking as true Lamb's allegations, Wysocki's alleged conduct could constitute a violation of Lamb's Fourth Amendment right to be free from excessive force.

The qualified immunity analysis does not stop there, however.  Taking as true Lamb's allegations, it must also be determined that his right to be free from excessive force was "clearly established."  The Fourth Amendment provides an explicit textual source of constitutional protection against an individual's right to be free from police applications of excessive force.  See Albright v. Oliver, 510 U.S. 266, 281

(1994).  Because it has been found for the purposes of summary
judgment that Lamb's allegations of Wysocki's conduct, when taken
as true, rise to the level of excessive force, and the Fourth
Amendment explicitly prohibits such conduct, that right is
clearly established, such that Wysocki or any other reasonable
officer should know not to use excessive force when effecting an
arrest.

Consequently, because disputed issues of material fact
remain as to Lamb's excessive force claims, and because those
claims, if proven, could rise to the level of a constitutional
violation for which Wysocki would not be entitled to qualified
immunity, Wysocki's motion for summary judgment must be denied.

**(ii) False arrest**

Lamb also claims that he was falsely arrested in violation
of the Fourth Amendment.  A warrantless arrest by a law officer
is reasonable under the Fourth Amendment where there is probable
cause to believe that a criminal offense has been or is being
committed.  Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004).
Whether probable cause exists depends upon the reasonable
conclusion to be drawn from the facts known to the arresting
officer at the time of the arrest.  Id.; see also  Wright v. City
of Philadelphia, 409 F.3d 595, 601 (3d Cir. 2005) (stating that
in order to determine whether an arrest is valid, the Court must
look to the law of the state where the arrest took place).

17

"Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt.  Rather, probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995) (citations omitted).  For a § 1983 claim based on false arrest, the inquiry is "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense."  Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).

An issue of material fact remains as to whether Wysocki had probable cause to arrest Lamb.  In his brief, Wysocki concludes that he had probable cause to arrest Lamb because he saw Lamb trying to steal the victim's watch.  The problem with this argument is that Lamb was not arrested for attempted theft or any other charge relating to Lamb stealing the victim's watch.  Instead, Lamb was arrested for "Obstructing Administration of Law or Other Government Function," which provides,

> A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to

18

> prevent a public servant from lawfully performing an
> official function by means of flight, intimidation,
> force, violence, or physical interference or obstacle,
> or by means of any independently unlawful act.

N.J.S.A. 2C:29-1.

It could be argued that Lamb's alleged stealing of a
victim's watch interfered with Wysocki's duty to care for the
accident victim and scene, and, thus, Wysocki had probable cause
to believe that Lamb violated N.J.S.A. 2C:29-1.  This position,
however, is not supported by the New Jersey courts'
interpretation of the statute.  The statute has been interpreted
to be "limited to situations where there is violent or physical
interference."  State v. Camillo, 382 887 A.2d 1151, 1154 (N.J.
Super. Ct. App. Div. 2005) (holding that defendant's act of
refusing to provide his name, date of birth, and social security
number to state trooper who required the information to prepare
an incident report did not constitute physical interference with
trooper's orders, as required to sustain conviction for
obstructing the administration of the law).  Thus, in this case,
because Lamb's alleged act of stealing the victim's watch was not
a physical interference with Wysocki's ability to care for the
accident scene, the attempted theft of the watch cannot serve the
basis for a violation of N.J.S.A. 2C:29-1.

Even if the stealing of a watch off of a victim was
sufficient to qualify as an unlawful act interfering with

Wysocki's official function, this position is flawed in other ways.  First, in order to be liable for a violation of N.J.S.A. 2C:29-1, when stealing the watch Lamb must have had the intent to "purposely obstruct" Wysocki in his duties.  Because Wysocki was not on the scene at the time Lamb allegedly attempted to take the victim's watch, he could not have tried to steal the watch to prevent Wysocki from taking care of the accident scene.[6]

Second, in the Third Circuit, the existence of probable cause in a § 1983 action is generally a question of fact for the jury to decide, Sherwood v. Mulvihill, 113 F.3d 396 (3d Cir. 1997) (citing Groman v. Township of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995)), especially in cases where the determination of probable cause rests on conflicts in credibility, Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).  This is such a case.

---

[6]In his police report, Wysocki states that because Lamb became physically and verbally abusive, it interfered with Wysocki being able to perform his official duties of taking care of the accident scene.  Even though Wysocki does not make this argument in his summary judgment brief, it is possible that Lamb acting physically and verbally abusive could constitute probable cause to believe that Lamb was violating N.J.S.A. 2C:29-1.  See State v. Wanczyk, 493 A.2d 6, 10-11 (N.J. Super. Ct. App. Div. 1985) (holding that in the context of a motion to suppress, officers had probable cause to arrest defendant for violating N.J.S.A. 2C:29-1 because defendant, by verbally and physically abusing the officers and physically resisting their efforts to complete their "pat-down," purposely impaired the police officers' efforts to perform their official function).  This argument would not be availing even if made in Wysocki's motion for summary judgment, however, because, as discussed below, questions of fact remain as to whether Wysocki had sufficient probable cause to arrest Lamb for such a violation.

Here, the only evidence supporting Wysocki's allegation that Lamb was attempting to steal the victim's watch is Wysocki's own testimony.  The only evidence supporting Lamb's contention that he was helping to adjust the victim's arms so they would not be lying in glass is Lamb's own testimony.  Thus, in order to determine whether Wysocki had probable cause to arrest Lamb, the Court is placed in a position to make a credibility determination.  The Court is not permitted to do so.  Therefore, a disputed issue of material fact remains as to probable cause, and, correspondingly, an issue of material fact exists as to whether Wysocki is entitled to qualified immunity.[7]  Consequently, summary judgment must be denied on Lamb's false arrest claim.

### (iii) Malicious prosecution brought pursuant to § 1983[8]

Lamb has also brought a malicious prosecution claim against Wysocki.  To prove malicious prosecution under § 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant

---

[7]For the second part of the qualified immunity analysis, it is "clearly established" that an officer cannot make an arrest without probable cause.  Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004).

[8]Plaintiffs have also brought a malicious prosecution claim under state law.  That claim will be discussed in the section concerning plaintiffs' state law claims.

initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007) (citing Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)). Malicious prosecution differs from false arrest in that a claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or arraignment, and not more. Id. at 81 (citing Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998); Heck v. Humphrey, 512 U.S. 477, 484 (1994) ("[U]nlike the related cause of action for false arrest or imprisonment, [malicious prosecution] permits damages for confinement imposed pursuant to legal process.")). A claim for malicious prosecution will fail, however, if it has been determined that probable cause existed in considering a false arrest claim. See id. at 86.

Wysocki is not entitled to summary judgment on Lamb's malicious prosecution claim. First, it is undisputed that Wysocki initiated a criminal proceeding, it was ended in Lamb's favor, and Lamb suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. These factors support Lamb's malicious prosecution claim.

22

Second, it is still disputed whether Wysocki had probable cause to arrest Lamb and whether Wysocki acted maliciously or for a purpose other than bringing Lamb to justice.  Because disputed issues of material fact exist as to Lamb's malicious prosecution claim, disputed issues of fact remain as to whether Wysocki is entitled to summary judgment.[9]  Consequently, summary judgment must be denied.

> **b.   *Lamb's claims of false arrest, false imprisonment, malicious prosecution, assault and battery, and Susan Lamb's claim of loss of consortium under New Jersey state law***

Plaintiffs have also asserted claims under New Jersey state law against Wysocki for false arrest, false imprisonment, malicious prosecution, assault and battery, and loss of consortium.  Wysocki has moved for summary judgment on these state law claims because plaintiffs have failed to comply with the New Jersey Tort Claims Act (NJTCA).

The NJTCA provides, "No action shall be brought against a public entity or public employee under this Act unless the claim upon which it is based shall have been presented in accordance with the procedures set forth in this chapter."  N.J.S.A. 59:8-3. A tort claim notice "must be served upon the public entity within

---

[9]For the qualified immunity analysis, it is "clearly established" that an officer cannot arrest someone without probable cause and with a malicious intent.

90 days of the accrual of the claim, and failure to do so will forever bar the claimant from recovering against a public entity or public employee." N.J.S.A. 59:8-8. The accrual date under the NJTCA is generally the date on which the alleged tort is committed. Beauchamp v. Amedio, 751 A.2d 1047, 1050 (N.J. 2000).

Here, plaintiffs did not file a notice of claim within 90 days of May 14, 2004, when the alleged torts were committed, but rather on November 19, 2004, six months after the accrual date of their claim. The NJTCA allows for a relaxation of the 90 day rule, but only upon a showing of extraordinary circumstances. The relevant provision provides,

> A claimant who fails to file notice of his claim within 90 days as provided in section 59:8-8 of this act, may, in the discretion of a judge of the Superior Court, be permitted to file such notice at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby. Application to the court for permission to file a late notice of claim shall be made upon motion supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his failure to file notice of claim within the period of time prescribed by section 59:8-8 of this act or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter; provided that in no event may any suit against a public entity or a public employee arising under this act be filed later than two years from the time of the accrual of the claim.

N.J.S.A. 59:8-9.

As Wysocki points out, plaintiffs have not provided any

explanation for why they failed to timely file their tort claim notice.  Plaintiffs have not filed a motion seeking application of N.J.S.A. 59:8-9 to their case, and they have not provided any affidavits showing sufficient reasons constituting extraordinary circumstances for their failure to file a timely notice of claim. As such, any claims subject to the NJTCA are barred.

The requirement to serve a tort claim notice applies to claims based on negligence, as well as intentional torts.  See Velez v. City of Jersey City, 850 A.2d 1238, 1239 (N.J. 2004). However, the requirement that a plaintiff serve a tort claim notice for intentional torts only relates to claims arising after June 29, 2004.  See id. at 1256 (interpreting the NJTCA's notice requirements to apply also to claims for intentional torts, but stating that the holding "applied prospectively to all similar causes of action accruing after [June 29, 2004]"); see also Hernandez v. City of Union City, 2008 WL 364275, *3 (3d Cir. 2008).  Thus, to determine whether plaintiffs' untimely notice of claim bars their state law claims, first it must be determined if plaintiffs have alleged claims for intentional torts.  If so, it must then be determined whether those claims accrued prior to June 29, 2004.

As a primary matter, Susan Lamb's claim for loss of consortium is not an intentional tort, and therefore, is barred because of plaintiffs' late tort claim notice.  Lamb's claims for

false arrest, false imprisonment, malicious prosecution, and assault and battery, however, are all classified as intentional torts under the NJTCA.  See N.J.S.A. 59:3-14 (a public employee is not immune if he or she engaged in conduct that "constituted a crime, actual fraud, actual malice or willful misconduct"); N.J.S.A. 59:3-3 ("A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."). Lamb's false arrest, false imprisonment, and assault and battery claims all accrued on May 14, 2004.  Consequently, these claims are not barred by the NJTCA for his late filing of his claim notice.

Lamb's malicious prosecution claim is a different matter.  A malicious prosecution claim does not accrue until "the underlying criminal proceedings are terminated in the plaintiff's favor." Rose v. Bartle, 871 F.2d 331, 348 (3d Cir.1989).  It is unclear from the record on what date the criminal proceedings against Lamb were terminated.  Lamb has provided a notice from the New Jersey Superior Court, dated May 24, 2004, which states that the matter was being downgraded and referred to the municipal court. (Pl. Ex. E.)  Even though it appears undisputed that the charge against Lamb was eventually dropped, there is no indication in the record when that occurred.  If it occurred after June 29, 2004, his state law malicious prosecution claim will be barred

because of his late notice filing.  If it occurred prior to June
29, 2004, it would not be barred.  In order to resolve this
issue, the Court will direct plaintiffs to submit a certification
detailing the final disposition of the charges against Lamb.

Even though Lamb's false arrest, false imprisonment, and
assault and battery claims, and possibly his malicious
prosecution claim, are not barred because of plaintiffs' untimely
filing of their tort claim notice, it must be determined whether
the "verbal threshold" of the NJTCA applies to these claims, and
whether plaintiffs have met this threshold if it does apply.
See N.J.S.A. 59:9-2 ("No damages shall be awarded against a
public entity or public employee for pain and suffering resulting
from any injury; provided, however, that this limitation on the
recovery of damages for pain and suffering shall not apply in
cases of permanent loss of a bodily function, permanent
disfigurement or dismemberment where the medical treatment
expenses are in excess of $3,600.00.").

It has been held that the verbal threshold does not apply to
malicious prosecution claims or claims for assault and battery.
See Monaco v. City of Camden, 2008 WL 408423, *11 (D.N.J. 2008)
(holding that the NJTCA's verbal threshold does not apply to
malicious prosecution claims); Kelly v. County of Monmouth, 883
A.2d 411, 417 (N.J. Super. Ct. App. Div. 2005) (holding that if a
plaintiff can show that the public employee willfully committed

27

an assault or battery upon the plaintiff, or to the extent it can
be shown that his tortious conduct exceeded the scope of his
employment, the application of the verbal threshold is
precluded).  Thus, Lamb's malicious prosecution and assault and
battery claims are not barred under the NJTCA.[10]

    In contrast, it has been held that the verbal threshold
applies to common law false arrest and false imprisonment claims.
DelaCruz v. Borough of Hillsdale, 870 A.2d 259, 261 (N.J. 2005)
(holding that NJTCA's "verbal threshold applies to common law
false arrest/false imprisonment claims").  Thus, it must be
determined whether Lamb has provided evidence that he has
suffered permanent loss of a bodily function, permanent
disfigurement or dismemberment, and incurred medical treatment
expenses are in excess of $3,600.00.  See, e.g., Gilhooley v.
County of Union, 753 A.2d 1137, 1142 (N.J. 2000) ("[I]n order to
vault the pain and suffering threshold under the Tort Claims Act,
a plaintiff must satisfy a two-pronged standard by proving (1) an
objective permanent injury, and (2) a permanent loss of a bodily
function that is substantial.").

    Wysocki contends that Lamb cannot meet this threshold
because his only medical treatment was the emergency room visit
on May 15, 2004, and his diagnosis was a strained shoulder.

---

    [10]Wysocki has not moved for summary judgment on plaintiffs'
state law malicious prosecution and assault and battery claims
substantively.

Wysocki argues that this does not meet the $3,600 medical bill requirement and it does not evidence that Lamb has suffered permanent lost of bodily function.

Lamb does not challenge Wysocki's argument, and he does not articulate, or provide evidence to support, how he has suffered a permanent injury.  Consequently, because Lamb cannot meet the verbal threshold requirement of the NJTCA for his common law false arrest and false imprisonment claims, Wysocki is entitled to summary judgment on these claims.

### 2.  Plaintiffs' claims against the City of Camden

Lamb claims that the City of Camden has a custom of failing to adequately train, supervise or discipline its police officers in the use of force.  Lamb also claims that the City of Camden also has a corresponding custom of failing to adequately investigate complaints of excessive force against its police officers.  The City of Camden denies these allegations, and argues that it is entitled to summary judgment because Lamb has failed to provide any proof of such customs.

Liability under § 1983 may be imposed on municipalities where acts of the government employee are deemed to be the result of a policy or custom of the municipality for whom the employee works.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978); Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).  Monell created a

"two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citation omitted).  The two-path track is described as follows:

> Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict.  A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

Id. (citation omitted).

To prove a custom claim, a plaintiff must produce evidence either that the policymaker's action violated the plaintiff's rights or that the policymaker failed to act when presented with an obvious need for action, rendering the municipality "deliberately indifferent to the need." Natale, 318 F.3d 575 at 584 (citation omitted).  Municipal liability also requires the plaintiff to demonstrate that "'there is a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.'" Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir. 2001) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  The link between the policy or custom and the injury may not be attenuated or suppositional; the plaintiff must demonstrate that the policymaker's actions "directly caused constitutional harm." Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 175 (3d Cir. 2001)

30

Custom may also be established by evidence of knowledge and
acquiescence.  Beck, 89 F.3d 971 (citation omitted).

     Here, Lamb presents three complaints of excessive force
levied against Wysocki as evidence that the City of Camden has a
custom of not investigating complaints.  These incidents include
one complaint of assault in 1981, one complaint of assault in
1982, and Lamb's complaint in 2004.  Lamb also presents as
evidence of the City's custom the fact that the City failed to
produce, in response to a request for production of documents,
any records or documents relating to the prior excessive force
complaints against Wysocki.  Lamb argues that this evidence is
sufficient to allow his claim to go to a jury.

     To further support his position, Lamb relies on Beck v. City
of Pittsburgh.  In Beck, the Third Circuit reversed the district
court's grant of summary judgment on a plaintiff's municipal
liability claim that the City of Pittsburgh had a custom of not
investigating complaints against its officers.  Beck, 89 F.3d at
972-73.  Complaints against the officer had been lodged in
October 1990, April 1991, June 1991, July 1991, November 1993,
and January 1994.  Id. at 969-70.  The Third Circuit found that
these written complaints against the officer, especially those
during the year 1991, which came in a narrow period of time and
were of similar nature, were sufficient evidence for a reasonable
jury to infer that the chief of police knew, or should have

known, the officer's violent behavior in arresting citizens, even
when the arrestee behaved peacefully, in orderly fashion,
complied with all of the officer's demands, and offered no
resistance.  Id. at 973-74.

The City of Camden argues that Lamb's reliance on Beck is
misplaced, because it is factually distinguishable.  The City
argues that the two complaints against Wysocki that occurred more
than twenty years previously do not show the same series of
complaints within a narrow period of time that supported the
Third Circuit's reasoning in Beck.  Additionally, the City argues
that Lamb never conducted any discovery as to how the City
investigated citizen complaints.  Lamb did not depose anyone from
the Internal Affairs section, and he did not request any
information on the investigative procedures of the police
department.  With regard to Lamb's claim that the City's lack of
response to his discovery request shows evidence-by-omission that
it does have a custom of not investigating complaints, the City
argues that the discovery request was overbroad and impossible to
comply with.  The City also argues that Lamb never filed a motion
to compel or otherwise followed-up with his request.  The City
contends that Lamb's evidence is insufficient to meet his burden
under Monell to survive summary judgment.

The City's arguments are persuasive.  First, Beck is
factually distinguishable to the situation here, primarily

32

because the complaints against the officer in <u>Beck</u> constituted a
series of complaints regarding similar conduct within a narrow
time frame.  The fact that two complaints were lodged against
Wysocki in 1981 and 1982, and no more until Lamb's complaint in
2004, does not rise to the level that a reasonable jury could
infer that the City knew, or should have known, of Wyscoki's
violent behavior in arresting citizens.

Second, the fact that the City did not respond to one of
Lamb's discovery requests does not evidence that the City has
admitted to a custom of not investigating citizen complaints.
Lamb requested, "All documents that refer, reflect or relate to
any involvement of the named Defendant/Police Officer(s) and
employees in any incident (other than the subject incident) in
which it was alleged, either formally or informally, that they
illegally arrested a person, used excessive force or committed
assault and battery in attempting to arrest a person or that they
otherwise violated a citizens (sic) constitutional, statutory or
common law rights."  (Pl. Br. at 6.)  Although Lamb made this
request, Lamb took no action to compel the production of these
documents.  Even if the City did not have a valid reason for
ignoring this request, the Court cannot assume that the request
would have garnered proof of Lamb's <u>Monell</u> claim.  Additionally,
a failure to respond to a discovery request does not create the
inference that the party has made a tacit admission of fact.

Lamb's only evidence of the City's custom of not investigating complaints against its officers is two complaints lodged against Wysocki in 1981 and 1982, and then Lamb's in 2004. This is not sufficient to show an issue of material fact with regard to whether the City failed to act when presented with an obvious need for action.  Further, this evidence is not sufficient to show an issue of material fact with regard to whether this custom caused Lamb's injuries.  Consequently, the City of Camden is entitled to summary judgment on Lamb's municipal liability claim.

## CONCLUSION

Based on the foregoing, Wysocki is entitled to summary judgment on Lamb's state law false arrest/false imprisonment claims in Count IV, and Susan Lamb's loss of consortium claim in Count VI.  Wysocki's motion is denied as to Lamb's constitutional violation claims of excessive force, false arrest, and malicious prosecution in Counts I and II, as well as Lamb's state law claim for assault and battery in Count V.  Wysocki's motion concerning Lamb's state law malicious prosecution claim in Count IV is continued for twenty days pending Lamb's submission with regard to the disposition of his criminal charges.  The City of Camden is entitled to summary judgment on plaintiffs' sole claim against

34

it--municipal liability in Count III.

An appropriate Order will be entered.


Dated: April 10, 2008                    s/ Noel L. Hillman

At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.

35